IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LINC-DROP, INC., A Nebraska Corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>CITY OF LINCOLN, A political subdivision of the State of Nebraska, et al.,<br><br>    Defendants. | 4:13-CV-3133<br><br>MEMORANDUM AND ORDER |

  The plaintiff, Linc-Drop, Inc., is a for-profit corporation that owns and maintains donation drop boxes for secondhand clothing donated to the March of Dimes. In this case, Linc-Drop is challenging the constitutionality of a Lincoln, Nebraska municipal ordinance that requires a permit for such boxes, limits the issuance of permits to certain non-profit organizations, and requires that at least 80 percent of the proceeds from the boxes be used for charitable purposes.

  This matter is currently before the Court on Linc-Drop's motion for a preliminary injunction (filing 3). The Court finds that given the relevant Supreme Court precedent, Linc-Drop is highly likely to succeed on the merits of its complaint, and that the other criteria for issuance of a preliminary injunction are satisfied. Therefore, the Court will grant Linc-Drop's motion and enjoin enforcement of the ordinance.

BACKGROUND

  Linc-Drop, by contract, is responsible for maintaining donation drop boxes placed on private property for collecting secondhand clothing and other items that are being donated to the Nebraska chapter of the March of Dimes, a non-profit charity. Filing 53-2 at 12-13; filing 53-3 at 12, 23. The March of Dimes, through independent contractors, contracts with landowners for locations to place donation boxes. Filing 53-2 at 36-37; filing 53-3 at 20-21, 48-49. Linc-Drop then constructs and places the donation boxes at those locations on behalf of the March of Dimes. Filing 53-2 at 37; filing 53-3 at 55.

Each donation box resembles a small shed, with a swinging door at the top to accept donations. Filing 2-4. The donation box is labeled "Clothing Donation Drop Off," and a sign on the donation box solicits the donation of clothing, accessories, linens, housewares, and small household goods. Filing 48-2. The sign prominently displays the name and logo of the March of Dimes, along with recycling logos, and briefly explains what the March of Dimes does. Filing 48-2. Another sign states that "A portion of the proceeds Helps Support March of Dimes Babies." Filing 48-2. Nothing on the box mentions Linc-Drop. Filing 48-2.

The March of Dimes technically owns the clothing until it is sold, but Linc-Drop owns the boxes themselves. Filing 53-2 at 51-53; filing 53-3 at 52, 59. The contract between the March of Dimes and Linc-Drop affords the March of Dimes the right to direct Linc-Drop to deliver the collected goods to a location chosen by the March of Dimes, although the March of Dimes has never exercised that right. Filing 53-2 at 50-51, 67; filing 53-3 at 54. Instead, Linc-Drop sells the donated clothing to used clothing graders and recyclers at 20¢ per pound. Filing 53-2 at 54; filing 53-3 at 60. Linc-Drop then pays the March of Dimes 2¢ per pound, which amounts to about $25,000-30,000 per year to the March of Dimes from donation boxes in Lincoln. Filing 53-2 at 43-44, 54, 67; filing 53-3 at 21, 37.

Apparently in response to Linc-Drop's activities, the City of Lincoln enacted Lincoln, Neb., Code Ch. 9.30, "Donation Boxes" ("the Ordinance").[1] *See* filings 2-1 and 2-2. The hearing testimony in favor of the Ordinance generally expressed the frustration of other local charities that items placed in Linc-Drop's donation boxes were sent out of Lincoln, and explained that other local recipients of donated items were being deprived of resources by competition from Linc-Drop's services. Supporters of the Ordinance were generally of the opinion that other local charities did more good in the community with the proceeds of donations. *See generally* filing 48-1.

As relevant, the Ordinance explains:

> (a) It has come to the attention of the council that commercial enterprises are soliciting donations of clothing, household items, or other items of personal property to donation boxes that appear to be for charitable purposes, but that such commercial enterprises may thereafter be selling such items for profit with little or no benefit to any charitable organization.

---

[1] The transcript of the City Council hearing and the record as a whole make clear that Linc-Drop was the reason the Ordinance was enacted—there is no evidence of any other business or charity in Lincoln placing similar donation boxes before the Ordinance was enacted.

> Maintenance of such donation boxes by commercial enterprises have the potential to deceive the public into believing that they are making contributions to charity, cause taxpayers to attempt to claim improper tax deductions on state and federal income tax returns in the mistaken belief that they have made deductions [sic] to a charitable organization, and divert donations from charitable organizations within the city that perform valuable services for the residents of Lincoln.
>
> (b)   It is the purpose of this chapter to prevent deception and confusion of the public, prevent mistaken attempts to claim tax deductions for charitable contributions, and to support the public purposes and benefits of legitimate charitable organizations by prohibiting commercial enterprises from soliciting donations of household items, clothing or other items of personal property by the furnishing of commercial donation boxes on commercial properties, which result in gifts to such commercial enterprises that do not benefit charitable organizations or purposes.

Ch. 9.30.20.

Two provisions of the Ordinance are particularly critical. First, the Ordinance provides that no person may "place or hold out to the public any donation box for people to drop off articles of unwanted household items, clothing or other items of personal property, unless at least 80% of the gross proceeds from the sale of such items shall be utilized for charitable purposes." Ch. 9.30.030(a). "Charitable purposes" is not defined by the Ordinance. Second, the Ordinance prohibits the placement or use of a donation box without a permit from the City, ch. 9.30.030(b), and

> [o]nly entities or organizations that have a tax status under Section 501(c)(3) of the Internal Revenue Code, as amended, or a public, parochial or private school, may apply for and obtain a permit. Proof of such tax status or that the applicant is a public, parochial or private school and a letter of authority or permission from the owner of the real property upon which the donation box is to be located must accompany an application for a permit.

Ch. 9.30.040(b). The fee for a permit is $150.00. Ch. 9.30.040(e).

In addition, a donation box must have "clearly identified, in writing, on its face the charitable organization that is maintaining the donation box." Ch. 9.30.040(c). A "charitable organization" under the Ordinance is

- 3 -

> a benevolent, educational, philanthropic, humane, patriotic, religious, or eleemosynary organization of persons organized for any lawful purpose or purposes not involving pecuniary profit or gain for its officers or members that has received a determination that it is exempt under Section 501(c)(3) of the federal "Internal Revenue Code of 1986", as amended, or a public, parochial or private school.

Ch. 9.30.010. (In other words, not a *for-profit* company.) Violation of the Ordinance is a misdemeanor punishable by a fine of up to $500 or up to 6 months' imprisonment, and each day that a violation continues is a separate offense, punishable as such. Ch. 9.30.50(c). And persons punishable for such violations include not only the owner or maintainer of a donation box, but the owner or lessee of the premises on which a donation box is maintained. Ch. 9.30.50(a).

Before the Ordinance took effect, Linc-Drop filed this action against the City and several City officials (collectively, "the City"), and asked the Court to enjoin enforcement of the Ordinance based on the City's alleged violation of the Free Speech Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Filing 1; filing 3. The City agreed not to enforce the Ordinance until the Court had resolved Linc-Drop's motion for a preliminary injunction. *See* filing 13. The parties, after submitting evidence and briefing the issues, advised the Court that an in-court hearing on the motion was unnecessary.[2] *See* filing 62. As a result, the matter is fully submitted for disposition. *See* filing 62.

## STANDARD OF REVIEW

When deciding whether to issue a preliminary injunction, the Court turns to the four *Dataphase* factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013); (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). A preliminary injunction is an extraordinary remedy, and the

---

[2] An evidentiary hearing is only required before issuing an preliminary injunction if there is a material factual controversy. *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 744-45 (8th Cir. 2002); *see also*, *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552-53 (6th Cir. 2007); *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211 (11th Cir. 2003); *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 893-94 (1st Cir. 1988).

movant bears the burden of establishing its propriety. *Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *see also H&R Block Tax Servs. LLC v. Acevedo-Lopez*, No. 13-1387, 2014 WL 539788, at *2 (8th Cir. Feb. 12, 2014). And in a challenge to a federal statute, state statute, or other government action based on presumptively reasoned democratic processes, the movant must show that he or she is likely to prevail on the merits. *Johnson*, 729 F.3d at 1098. But, when a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied. *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012); *see also Johnson*, 729 F.3d at 1102.

## ANALYSIS

Linc-Drop's arguments separately challenge the two primary provisions of the Ordinance: the requirement that 80 percent of the proceeds from donations be used for charitable purposes, and the permit requirement. Linc-Drop's arguments rely on several pertinent Supreme Court decisions. Because of that, it will be clearer to examine those decisions in some detail before returning to discuss the parties' specific arguments.

### SUPREME COURT PRECEDENT

In *Murdock v. Pennsylvania*, 319 U.S. 105, 106-07 (1943), the defendants were Jehovah's Witnesses who had been convicted of violating a municipal ordinance requiring persons "canvassing" or "soliciting" within the municipality to purchase a license to do so. The defendants, without obtaining a license, had been engaged in distributing religious literature and soliciting the purchase of other religious books and pamphlets. *Id.* But the Supreme Court reversed their convictions on First Amendment grounds, reasoning that "a tax laid specifically on the exercise of [First Amendment] freedoms would be unconstitutional . . . [y]et the license tax imposed by [the municipal] ordinance is in substance just that." *Id.* at 108. The Court emphasized that the ordinance at issue was not a simple registration system, under which those going from house to house were required to identify themselves to the authorities. *Id.* at 113. The license tax was, instead, a fixed amount unrelated to the scope of the activities of the defendants or their earnings, and was not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question. *Id.* at 113-14. Instead, it was a flat fee collected as a condition to exercising First Amendment freedoms, and served to restrain and suppress the exercise of those freedoms. *Id.* at 114.

Relying in part on *Murdock*, the Court in *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 630 (1980), struck down the first of a series of laws with a marked similarity to the Ordinance at issue in this case. In *Schaumburg*, a village ordinance prohibited charitable organizations from soliciting contributions unless they used at least 75 percent of their receipts "'directly for the charitable purpose of the organization.'" *Id.* at 624. The term "charitable purposes" was defined to exclude salaries and commissions paid to solicitors, and other administrative expenses. *Id.* And, much like the City in this case, the village justified the ordinance by asserting that an enterprise that did not devote enough of its receipts to "charitable purposes" was fraudulently misrepresenting itself as a charity. *Id.* at 636.

The Court began by making clear that solicitation of charitable donations was, without question, speech protected by the First Amendment. *Id.* at 633. Accordingly, the 75-percent limitation was "a direct and substantial limitation on protected activity" that could not be sustained unless it served a "sufficiently strong, subordinating" governmental interest. *Id.* at 636. The Court agreed that fraud prevention was a substantial governmental interest, but found that the 75-percent requirement "only peripherally" served that interest, because an organization may use more than 25 percent of its receipts on fundraising, salaries, and overhead and still remain a "charitable" enterprise. *Id.* at 636-37. The village could not, consistent with the First Amendment, label such groups "'fraudulent'" and bar them from soliciting donations. *Id.* at 637. Nor, the Court explained, could the village

> lump such organizations with those that in fact are using the charitable label as a cloak for profitmaking and refuse to employ more precise measures to separate one kind from the other. The Village may serve its legitimate interests, but it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms.
>
> The Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation. Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly. Efforts to promote disclosure of the finances of charitable organizations also may assist in preventing fraud by informing the public of the ways in which their contributions will be employed. Such measures may help make contribution decisions more informed, while leaving to individual choice the decision whether to

- 6 -

>contribute to organizations that spend large amounts on salaries and administrative expenses.

*Id.* at 637-38 (citations omitted).

Four years later, in *Secretary of State of Md. v. Munson*, 467 U.S. 947, 950 (1984), the Court invalidated a Maryland law that prohibited charitable organizations from fundraising if they paid or agreed to pay as expenses more than 25 percent of the amount raised. The Maryland law was distinguishable from *Schaumburg*, because it permitted an exception if the 25-percent limitation "'would effectively prevent the charitable organization from raising contributions.'" *Munson,* 467 U.S. at 950-951, n.2. But the Court held that the waiver provision did not save the statute. *Id.* at 962. The Court explained that while there

>no doubt are organizations that have high fundraising costs not due to protected First Amendment activity and that, therefore, should not be heard to complain that their activities are prohibited, this statute cannot distinguish those organizations from charities that have high costs due to protected First Amendment activities. The flaw in the statute is not simply that it includes within its sweep some impermissible applications, but that in all its applications it operates on a fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud. That the statute in some of its applications actually prevents the misdirection of funds from the organization's purported charitable goal is little more than fortuitous. It is equally likely that the statute will restrict First Amendment activity that results in high costs but is itself a part of the charity's goal or that is simply attributable to the fact that the charity's cause proves to be unpopular. On the other hand, if an organization indulges in fraud, there is nothing in the percentage limitation that prevents it from misdirecting funds. In either event, the percentage limitation, though restricting solicitation costs, will have done nothing to prevent fraud.

*Munson,* 467 U.S. at 966-67. Fraud could be punished directly, and the charitable organization could be required to disclose its finances so that a member of the public could make an informed decision about whether to contribute. *Id.* at 961 n.9.

The Court expressly extended *Schaumburg* and *Munson* to professional fundraisers in *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781 (1988).

- 7 -

In *Riley*, a North Carolina law prohibited professional fundraisers from retaining an "'unreasonable'" or "'excessive'" fee. 487 U.S. at 784. Fees below 20 percent of the gross receipts were deemed reasonable, fees between 20 and 35 percent were deemed unreasonable if the State could prove that the solicitation did not involve advocacy or disseminating information, and fees above 35 percent were presumptively unreasonable. *Id.* at 784-86. But the Court invalidated the law, holding once again that fraud cannot be inferred simply from the percentage of charitable donations allocated to fundraising costs. *Id.* at 789; *see Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 615 (2003). "[T]he solicitation of charitable contributions is protected speech, and . . . using percentages to decide the legality of the fundraiser's fee is not narrowly tailored to the State's interest in preventing fraud." *Riley*, 487 U.S. at 789. The Court explained that

> there are several legitimate reasons why a charity might reject the State's overarching measure of a fundraising drive's legitimacy—the percentage of gross receipts remitted to the charity. For example, a charity might choose a particular type of fundraising drive, or a particular solicitor, expecting to receive a large sum as measured by total dollars rather than the percentage of dollars remitted.

*Id.* at 791-92. The North Carolina law also required professional fundraisers to disclose to potential donors, before soliciting funds, what percentage of its previous year's receipts it had actually turned over to a charity. *Id.* at 795. North Carolina argued that the provision was an appropriate means to inform the public. *See id.* at 798. But the Court disagreed, characterizing the disclosure provision as "unduly burdensome," and based on the incorrect assumption that the charity did not "benefit from funds collected but not turned over to it." *Id.* at 798, 800.

In sum, "[i]n *Schaumburg*, *Munson*, and *Riley*, the Court invalidated laws that prohibited charitable organizations or fundraisers from engaging in charitable solicitation if they spent high percentages of donated funds on fundraising—whether or not any fraudulent representations were made to potential donors." *Madigan*, 538 U.S. at 619. The Court has drawn a clear constitutional line "'between regulation aimed at fraud and regulation aimed at something else in the hope that it would sweep fraud in during the process.'" *Id.* at 619-20 (quoting *Munson*, 467 U.S. at 969-70).

STANDING

Against that backdrop, the Ordinance's constitutional flaws are readily apparent. But first, the Court must address the City's argument that Linc-Drop lacks standing to raise them. The City's primary argument seems to be that it is the March of Dimes, not Linc-Drop, whose constitutional rights are really at issue. Filing 49 at 8-9. But that argument is squarely foreclosed by *Munson*.

In *Munson*, the Court reiterated the familiar principle that prudentially, a plaintiff generally must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties. 467 U.S. at 955. That limitation frees the courts from unnecessary pronouncements on constitutional issues, and from prematurely interpreting statutes in areas where their constitution application might be cloudy, and it assures the court that the issues before it will be concrete and sharply presented. *Id.*

But the plaintiff in *Munson* was, like Linc-Drop, a for-profit professional fundraiser, not a charity.[3] 467 U.S. at 950. The plaintiff did not claim that its own First Amendment rights had or would be infringed by the challenged statute. *Id.* at 955. Yet the Court found no prudential reason not to allow the plaintiff to challenge the statute pursuant to the doctrine of *jus tertii* standing, explaining that the plaintiff had a sufficient injury-in-fact to satisfy Article III's case-or-controversy requirement, and that as a prudential matter, the plaintiff could be reasonably expected to properly frame the issues and present them with the necessary adversarial zeal. *Id.* at 956, 958. In the First Amendment context, the Court said, "[f]acial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Id.* at 957-58. The activity sought to be protected was "at the heart of the business relationship" between the plaintiff and its clients, and the plaintiff's interests in challenging the statute were "completely consistent with the First Amendment interests of the charities it represents." *Id.* at 958.

The same is true here. Under the Ordinance, Linc-Drop would suffer an injury-in-fact, and its interest in challenging the Ordinance is entirely

---

[3] The City suggests that Linc-Drop is "a company contracting with [the March of Dimes] not even as a professional fundraiser." Filing 49 at 9, 15-17. But Linc-Drop is paid, by the March of Dimes, to solicit donations on its behalf. The Court does not know what the City understands the expression "professional fundraiser" to encompass, but Linc-Drop clearly meets any reasonable definition of the term. *Compare Munson*, 467 U.S. at 950 (characterizing a for-profit corporation engaged in promoting fundraising events as a "professional for-profit fundraiser").

- 9 -

consistent with that of the March of Dimes. The City, in fact, does not even attempt to argue that Linc-Drop cannot be expected to frame and present the issues adequately. The City contends that the overbreadth exception to prudential standing is "'strong medicine' that should be invoked only 'as a last resort,'" but the Court explained in *Munson* that concern over whether a regulation's overbreadth is "substantial" is properly reserved for the determination of a First Amendment challenge on the merits. 467 U.S. at 958-59. And furthermore, in *Riley*, the Court said that in addition to the relationship between a fundraiser's interests and a charity's speech, "the fundraiser has an independent First Amendment interest in the speech, even though payment is received." 487 U.S. at 794 n.8.

    The City also argues that Linc-Drop lacks standing because the various provisions of the Ordinance are severable. Filing 49 at 10-13. The City's argument goes something like this: even if the 80-percent requirement was struck down, Linc-Drop could not, as a for-profit company, obtain a permit to operate donation boxes. Filing 49 at 10-13. So, the City concludes, Linc-Drop's injury is not redressable, because the injury would still be inflicted by other provisions of the Ordinance. Filing 49 at 13 (citing *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801-02 (8th Cir. 2006)). It is true that the overbreadth doctrine applies on a provision-by-provision basis; that is, a plaintiff must establish an injury-in-fact under a particular provision of a regulation that is validly applied to its conduct, then assert a facial challenge, under the overbreadth doctrine, to vindicate the rights of others not before the Court under that provision. *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 210 (5th Cir. 2011); *see also Advantage Media*, 456 F.3d at 801-02. But the City's argument suffers from a fundamental flaw: Linc-Drop has *also* challenged the permit requirement, meaning that all of its injuries are fully redressable.[4] Even if the challenged provisions of the Ordinance are severable, Linc-Drop has standing to challenge each.

---

[4] And, the Court notes, Linc-Drop has alleged two distinct injuries: its inability to obtain a permit, *and* the effect on its business that necessarily flows from the 80-percent requirement. By contrast, in *Advantage Media*, the plaintiff was alleging a *single* injury in the denial of its permits, which was supported by both challenged and uncontroverted provisions. 456 F.3d at 798-800. The City even suggests in this case that Linc-Drop "could alter its operations to still service donation boxes placed by charities, provided that 80% of the proceeds serve charitable purposes." Filing 49 at 34. It would, therefore, hardly be speculative to find that Linc-Drop's business interests would be injured by the 80-percent requirement, even if its challenge to the permit requirement was unavailing.

## 80-PERCENT REQUIREMENT

Linc-Drop's central argument is that the 80-percent requirement of the Ordinance violates the First Amendment. When evaluating regulation of professional charitable solicitation, the Court considers whether (1) the City had a sufficient or legitimate interest in enacting the Ordinance, (2) the interest identified is significantly furthered by a narrowly-tailored regulation, and (3) the regulation substantially limits charitable solicitations. *See, Fraternal Order of Police v. Stenehjem*, 431 F.3d 591, 597 (8th Cir. 2005); *Ass'n of Cmty. Orgs. for Reform Now a/k/a ACORN v. City of Frontenac*, 714 F.2d 813, 817 (8th Cir. 1983); *see also*, *Riley*, 487 U.S. at 789; *Munson*, 467 U.S. at 960-61; *Schaumburg*, 444 U.S. at 636-37; *Abbott*, 647 F.3d at 213; *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1318 (11th Cir. 2000); *Am. Target Adver., Inc. v. Giani*, 199 F.3d 1241, 1247 (10th Cir. 2000). And while a duly-enacted regulation normally carries a presumption of constitutionality, when it allegedly infringes on the exercise of First Amendment rights, its proponent bears the burden of establishing its constitutionality. *ACORN*, 714 F.2d at 817; *see also Marijuana Prohibition*, 219 F.3d at 1318; *Giani*, 199 F.3d at 1247.

The City complains about that standard of review, arguing that it is inapplicable in this case. First, the City contends that Linc-Drop is not engaged in charitable solicitation—the City accuses Linc-Drop of "using [the March of Dimes'] name to hoodwink the City's unwitting residents into placing items in the donation boxes instead of donating them to legitimate charitable organizations." Filing 49 at 15. In fact, a substantial portion of the City's brief is devoted to attacking Linc-Drop's fundraising activities. *See* filing 49, *passim*.

In fact, Linc-Drop *is* engaged in charitable solicitation. The fact that it is paid to do so does not change that. *See Munson*, 467 U.S. at 967 n.16 (citing *Schaumburg*, 444 U.S. at 635-36); *see also Riley*, 487 U.S. at 787-790. But the problem with the City's argument is more fundamental: as the Court has repeatedly tried to tell the City, *Linc-Drop's conduct is not at issue in this case*. *See*, filing 47 at 4-5; filing 57 at 1. The issue in this case is the *constitutionality of the Ordinance*. Whether Linc-Drop is violating the Ordinance, or even whether Linc-Drop is defrauding people, does not change the provisions of the Ordinance or the reasons for its enactment. Therefore, the question is not whether Linc-Drop is engaged in charitable solicitation— it is whether the Ordinance regulates charitable solicitation. And it does. Law regulating the fees of professional charitable solicitors are not significantly different from laws regulating the expenditures of charities. *Shannon v. Telco Commc'ns*, 824 F.2d 150, 152-53 (1st Cir. 1987).

The City also contends that the donation boxes are more akin to billboards, and should be considered commercial speech instead of a charitable solicitation. Filing 49 at 17-18. But as the Fifth Circuit explained in rejecting an effectively-identical argument,

> solicitation [is] the act or an instance of requesting or seeking to obtain something. Solicitation is not limited to in-person communication. More importantly the speech interests identified in *Schaumburg*—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—are surely implicated by the public receptacles. The mere inclusion of the name of a charity on a donation box communicates information about the beneficiary of the benevolence and explicitly advocates for the donation of clothing and household goods to that particular charity. At a minimum, the donation boxes implicitly advocate for that charity's views, ideas, goals, causes, and values.

*Abbott*, 647 F.3d at 212-13 (citations and quotations omitted). Because citizens wishing to donate goods are "faced with a marketplace of charitable options; the public receptacles are not mere collection points for unwanted items, but are rather silent solicitors and advocates for particular charitable causes." *Id.* at 213. As a result, the donation boxes "represent far more than an 'upturned palm' or a mere 'proposal of a commercial transaction that says donate goods here.'" *Id.* "Rather, the donation bins' 'solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues.'" *Id.* (quoting *Schaumburg*, 444 U.S. at 632). Accordingly, the Fifth Circuit rejected the government's "characterization of the speech related to the public receptacles as mere commercial speech." *Id.* This Court agrees.

Once the merits of Linc-Drop's constitutional argument are reached, it is apparent that the Ordinance's 80-percent requirement cannot survive comparison to *Schaumburg*, *Munson*, and *Riley*. The City attempts to justify the Ordinance as serving two governmental purposes: "preventing deception and ensuring funds actually go to benefit charitable organizations."[5] Filing 49

---

[5] The City also makes reference to the possibility that the donation boxes display inaccurate information about the tax-deductibility of any donations, and suggests that there is a governmental interest in ensuring "that the public is not misled as to tax-deductible status." Filing 49 at 18. This does not strike the Court as being substantially different from attempting to protect the public from fraud. In any event, this suggestion requires only

- 12 -

at 19. The interest in protecting charities and the public from fraud is sufficiently substantial to justify a narrowly-tailored regulation. *Riley*, 487 U.S. at 793. But courts have repeatedly rejected the contention that a percentage requirement such as the Ordinance's is narrowly tailored to serve that interest. *See, Riley*, 487 U.S. at 789-90; *Munson*, 467 U.S. at 960-69; *Schaumburg*, 444 U.S. at 636-38; *Fernandes v. Limmer*, 663 F.2d 619, 630-31 (5th Cir. 1981); *State v. Events Int'l, Inc.*, 528 A.2d 458, 461-62 (Maine 1987). It could not, in fact, be more clear that using percentages to decide the legality of a fundraiser's fee is not narrowly tailored to the government's interest in preventing fraud. *Riley*, 487 U.S. at 789.

Nor is the Court persuaded by the City's asserted interest in ensuring that solicited funds actually benefit charitable organizations. The Supreme Court rejected a functionally-identical argument in *Riley*, dismissing the government's "paternalistic premise that charities' speech must be regulated for their own benefit." 487 U.S. at 790. The Court reasoned that "there are several legitimate reasons why a charity might reject the State's overarching measure of a fundraising drive's legitimacy" and concluded that even if the government "had a valid interest in protecting charities from their own naiveté or economic weakness," a percentage requirement was not narrowly tailored to achieve it. *Id.* at 791-92.

The City makes no meaningful attempt to distinguish these cases on their facts. The City, in fact, "urges the Court to review the dissent in *Riley* for the sensible proposition that the 80% requirement in the Ordinance should not be deemed an unconstitutional infringement." Filing 49 at 22. That, of course, is not how *stare decisis* works. *See Winslow v. Fed. Energy Regulatory Comm'n*, 587 F.3d 1133, 1135 (D.C. Cir. 2009) (citing U.S. Const. art. III, § 1). The Court declines the City's invitation to depart from Supreme Court precedent.

The City does suggest that because the Ordinance only regulates donation boxes, it does not prohibit other "innumerable methods of charitable solicitation," thereby "leav[ing] adequate alternative avenues for free speech." Filing 49 at 24. But as the Eighth Circuit has said, "'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" *ACORN*, 714 F.2d at 819 (quoting *Schneider v. New Jersey (Town of Irvington)*, 308 U.S. 147, 151-52 (1939)). The Ordinance is effectively proscribing an entire means of solicitation to some, but not all organizations—a means of solicitation that is

---

brief analysis: there is no reasonable basis to find that the 80-percent requirement (or the permit requirement) serves an interest in preventing shoddy tax advice, much less that it is narrowly tailored to do so.

apparently effective, and more importantly the one that has been chosen by the March of Dimes as best serving its needs. Whether a regulation leaves open alternative avenues for expression is relevant if it governs the time, place, and manner of the expression—for instance, a zoning ordinance. *See Blue Moon Entertainment, LLC v. Bates City, Mo.*, 441 F.3d 561, 565 (8th Cir. 2006). But this is clearly not a time, place, or manner regulation, as the limitations imposed by the Ordinance are based on the identity of the actor making the charitable solicitation and the disposition of any proceeds, not the time, place, or manner of the solicitation. *See Planned Parenthood League of Mass., Inc. v. Attorney Gen'l*, 464 N.E.2d 55, 60 (Mass. 1984); *cf. City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 427-29 (1993). The City does not explain why donation boxes—as opposed to other means of charitable solicitation—are more likely to produce fraud, or why the proceeds of donation boxes require more careful scrutiny than other solicited funds. So while the Ordinance may be narrower than the laws at issue in *Schaumburg*, *Munson*, and *Riley*, the Ordinance is no more narrowly *tailored* to the City's claimed interests in combatting fraud or promoting "legitimate" charities.

The City's reliance on *Madigan*, 538 U.S. 600, is also unavailing. *Madigan*, in fact, is so plainly distinguishable that it supports Linc-Drop's argument. The City characterizes *Madigan* as supporting the proposition that allegedly-fraudulent charitable solicitation is unprotected by the First Amendment. Filing 49 at 17. But in *Madigan*, the government had filed suit against professional fundraisers alleging, among other things, that particular solicitations contained specific misrepresentations regarding the extent to which any donations would be dedicated to identified charitable endeavors. 538 U.S. at 607-08. The Supreme Court found that those specific allegations saved the government's case, explaining that "[i]n contrast to the prior restraints inspected in [*Schaumburg*, *Munson*, and *Riley*], a properly tailored fraud action targeting fraudulent representations themselves employs no 'broad prophylactic rule,' lacking any 'nexus to the likelihood that the solicitation is fraudulent[.]'" *Madigan*, 538 U.S. at 619 (citations and quotations omitted).

Accordingly, the Supreme Court found that "[f]raud actions so tailored, targeting misleading affirmative representations about how donations will be used," are "plainly distinguishable . . . from the measures invalidated in *Schaumburg*, *Munson*, and *Riley*," reasoning that "[s]o long as the emphasis is on what the fundraisers misleadingly convey, and not on percentage limitations on solicitors' fees per se, such actions need not impermissibly chill protected speech." *Madigan*, 538 U.S. at 619. It is equally plain that the Ordinance is *not* such a tailored fraud action—it is, rather, precisely the sort

of "broad prophylactic rule" that the Supreme Court has repeatedly struck down. *See id.*

Simply put, under the Supreme Court's binding precedent, there is no doubt that the 80-percent requirement of the Ordinance is unconstitutionally overbroad. It is fair to say, then, that so far, Linc-Drop's likelihood of success on the merits is substantial.

## PERMIT REQUIREMENT

The permit requirement of the Ordinance fares no better. The City suggests, and Linc-Drop concedes, that some sort of registration or disclosure requirement could be constitutionally imposed. *See*, filing 49 at 20; filing 54 at 15. That much is clear. *See, e.g., Madigan*, 538 U.S. at 623; *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 162-63 (2002); *Riley*, 487 U.S. at 799-800; *Abbott*, 647 F.3d at 214-15; *Nat'l Fed'n of the Blind v. Fed. Trade Comm'n*, 420 F.3d 331, 343 (4th Cir. 2005). But the Ordinance goes beyond that: the Ordinance bars a professional fundraiser from obtaining a permit at all, thereby foreclosing a paid solicitor from using a donation box to solicit donations—and, in turn, preventing a charitable organization from *hiring* a paid solicitor to place a donation box.

And the government cannot, consistent with the First Amendment, ban a charity from hiring a professional fundraiser. *See, Riley*, 487 U.S. at 794-95; *Munson*, 467 U.S. at 967 n.16; *Planned Parenthood*, 464 N.E.2d at 61. If the government cannot "categorically restrain[]" solicitation by professional fundraisers "if a high percentage of the funds raised would be used to cover administrative or fundraising costs," *Madigan*, 538 U.S. at 610, then it is axiomatic that the government cannot categorically restrain solicitation by professional fundraisers, period. Barring professional fundraisers from placing donation boxes is certainly no more reasonably calculated—much less narrowly tailored—to the government's interest in preventing fraud.

Furthermore, mandatory application for a license or permit "is a prior restraint typically disfavored in First Amendment cases." *Nat'l Fed'n of the Blind,* 420 F.3d at 343; *see, Munson,* 467 U.S. at 968-69; *Schaumburg,* 444 U.S. at 629. "A scheme of prior restraint gives 'public officials the power to deny use of a forum in advance of actual expression.'" *Giani,* 199 F.3d at 1250 (quoting *Se. Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553 (1975)). Because the Ordinance bars Linc-Drop—*or any other person*—from soliciting via donation boxes before complying with the Ordinance's requirements, the Ordinance is by definition a prior restraint. *See id.* And it is well established that a prior restraint which fails to place limits on the time within which the decisionmaker must issue the license is impermissible. *Id.* (citing *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 225 (1990)); *see Riley,* 487 U.S. at 802. The

Ordinance "on its face does not purport to require when a determination must be made," *see Riley*, 487 U.S. at 802, so even if Linc-Drop were eligible for a permit, the Ordinance's permit requirement would be an unconstitutional prior restraint. The permit requirement is an impermissible prior restraint on the First Amendment rights of *any* person or organization wishing to place a donation box, whether or not they are eligible for such a permit.

And even if there was some constitutional justification for precluding professional fundraisers from placing donation boxes—and to be clear, there is not—the criteria used by the Ordinance to distinguish between a "legitimate" charity and a for-profit fundraiser are unjustifiable. The Ordinance allows a permit to be issued only to a school or a corporation that is tax-exempt under 26 U.S.C. § 501(c)(3). Tax-exempt corporations under § 501(c)(3) include those that are "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes." But § 501(c) exempts many other categories of non-profit organization, including other charities. For example, § 501(c)(4) exempts "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare," or local employee associations, "the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes."[6] Section 501(c) also exempts, among others, fraternal societies and military and veterans' associations. § 501(c)(8), (10), and (19). The Ordinance's use of § 501(c)(3) as a proxy for a non-profit or "charitable" organization is, at best, imperfect.

In sum, the Ordinance's permit requirement is no more constitutionally sound than the 80-percent requirement, for most of the same reasons. As a result, Linc-Drop's likelihood of success on the merits is obviously strong.

"CHARITABLE PURPOSES"

Linc-Drop also challenges the term "charitable purposes" as being unconstitutionally overbroad and vague. Because the Ordinance fails to define "charitable purposes," Linc-Drop argues, "it is unclear on exactly what 80-percent of donation box proceeds must be spent, making the provision overbroad." Filing 4 at 32. And, Linc-Drop says, the term is unconstitutionally vague because it neither provides adequate notice to citizens of what is required nor establishes adequate standards to prevent arbitrary or discriminatory enforcement. Filing 4 at 32; *see generally*, *Musser*

---

[6] "Generally speaking, the primary differences between Section 501(c)(3) organizations and Section 501(c)(4) organizations are that contributions to the former are tax deductible while those to the latter are not, and the latter can engage in some political activities while the former cannot." *United States v. George*, 448 F.3d 96, 99 n.4 (1st Cir. 2006); *see also Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 543 (1983).

*v. Mapes*, 718 F.3d 996, 1000 (8th Cir. 2013); *United States v. Tebeau*, 713 F.3d 955, 961 (8th Cir. 2013). The Court views Linc-Drop as primarily raising an issue of unconstitutional vagueness. As the Court understands Linc-Drop's overbreadth argument, it is that First Amendment-protected activity will be inhibited because it is not clear how to comply with the Ordinance—or, in other words, that the Ordinance is unconstitutionally overbroad *because* it is unconstitutionally vague.

The City again raises a question of standing, asserting that Linc-Drop does not have standing to raise a vagueness challenge because the overbreadth exception to prudential standing is not available on that issue. But Linc-Drop is not limited to asserting the First Amendment rights of others—it may, on this point, assert its own *Due Process* rights, because the vagueness doctrine is grounded in Due Process, not the First Amendment. *See United States v. Ghane*, 673 F.3d 771, 776-77 (8th Cir. 2012). In order for Linc-Drop to have standing to challenge the Ordinance as vague, it must be unconstitutional as applied to Linc-Drop's specific conduct at issue. *Musser*, 718 F.3d at 1000. And the term "charitable purposes," as given effect by the Ordinance, clearly implicates Linc-Drop's business activities. The Ordinance subjects "the person or entity which owns, maintains, or operates a donation box"—in other words, Linc-Drop—to criminal penalties if not enough of the proceeds are used for "charitable purposes." Ch. 9.30.030 and 9.30.50. It is, therefore, incumbent upon Linc-Drop to be aware of what constitutes a "charitable purpose," and Linc-Drop has standing to complain about the Ordinance's failure to define the term.

On the merits of Linc-Drop's argument, the Court is aware of authority—albeit not unanimous—suggesting that the term "charitable," in the context of solicitation, is a word of "common understanding" that a person of ordinary intelligence can discern. *See*, *Gospel Missions of America v. City of Los Angeles*, 419 F.3d 1042, 1048-49 (9th Cir. 2005); *Ryan v. World Church of the Creator*, 760 N.E.2d 953, 962 (Ill. 2001); *but see Assoc. of Cmty. Orgs. for Reform Now (ACORN) v. City of Chicago*, No. 84 C 10536, 1986 WL 2746, at *7-8 (N.D. Ill. Feb. 24, 1986). That said, those cases arose in the context of regulations directed at the general "charitable" purpose of an organization or event. *See id.* That is somewhat different from a regulation that, like the Ordinance, might well involve a detailed examination of an organization's accounting records to determine whether particular line items were or were not sufficiently "charitable." The Ordinance seems, on its face, to demand inquiry into not just the purpose of a solicitation or whether the proceeds of a

donation box are given to a charitable organization, but into how that organization spends the money.[7]

But given the Court's previous conclusions with respect to Linc-Drop's First Amendment arguments, it is not necessary to further address Linc-Drop's vagueness argument. While Linc-Drop's likelihood of success on this point is less clear, it has already established a likelihood of success on the overall merits that is sufficient to warrant a preliminary injunction.

## EQUAL PROTECTION

Similarly, it is not necessary for the Court to comprehensively evaluate Linc-Drop's Equal Protection argument. As with previous issues, the parties dispute even the standard of review. The City contends that the Ordinance's distinctions should be reviewed only for a rational basis. Filing 49 at 28-31. Linc-Drop, on the other hand, contends that heightened scrutiny is appropriate because First Amendment rights are implicated. Filing 54 at 44.

On that point, Linc-Drop has the better of the argument. Where a regulation implicates a fundamental right, such as the First Amendment's free speech guarantee, a court reviews the regulation under heightened scrutiny. *Peeper v. Callaway Cnty. Ambulance Dist.*, 122 F.3d 619, 622 (8th Cir. 1997) (citing *Clements v. Fashing*, 457 U.S. 957, 963 (1982)). Only if no fundamental right is implicated do traditional Equal Protection principles apply. *Id.*; *see also Carey v. Brown*, 447 U.S. 455, 461-62 (1980). Because First Amendment rights are implicated by the classifications created here, the Court must apply the same level of scrutiny to those classifications that is dictated by the First Amendment rights at issue. *See Peeper*, 122 F.3d at 622.

That having been said, there may be appropriate constitutional justifications for treating professional fundraisers differently in some respects from § 501(c)(3) corporations and schools, or stand-alone donation boxes from receptacles enclosed by a larger building. *Cf. Abbott*, 647 F.3d at 214-15. For instance, it might make sense to treat a professional fundraiser differently for purposes of some sort of registration or disclosure requirement. *See id.* Of course, the regulation at issue here goes far beyond registration or disclosure—but whether the Ordinance goes too far has already been discussed in the context of the First Amendment. And because Linc-Drop has established a likelihood of success on its First Amendment claims, the Court need not further consider its Equal Protection claim at this point. *See Child*

---

[7] That is, in fact, the *only* reasonable interpretation of the Ordinance, given that under the permit requirement, only § 501(c)(3) corporations or schools are permitted to have donation boxes. At that point, the only conceivable purpose for the 80-percent requirement is to regulate how those organizations spend each dollar of the proceeds.

*Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1004 n.4 (8th Cir. 2012).

### BALANCE OF *DATAPHASE* FACTORS

For the foregoing reasons, the Court finds that Linc-Drop has an extremely strong likelihood of success on the merits of its First Amendment claims. But the City also contends that Linc-Drop has not shown a threat of irreparable harm. Filing 49 at 34. This contention ignores black-letter law that "[t]he loss of First Amendment freedoms, for even minimal periods of time, *unquestionably* constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (emphasis supplied). A likelihood of success on the merits of a First Amendment claim is likely enough, standing alone, to establish irreparable harm. *Child Evangelism Fellowship*, 690 F.3d at 1000.

The City also contends that the balance of harms does not warrant temporary injunction, and that an injunction would not be in the public interest. Filing 49 at 35-38. But the City's arguments rest on the premise that the Ordinance is itself in the public interest because it protects the public, by preventing fraud and directing donations to "legitimate charities." Filing 49 at 38. That premise is no more sound here than in the earlier context of the City's First Amendment argument. And in any event, as noted above, when a plaintiff has shown a likely violation of the First Amendment, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied. *Swanson*, 692 F.3d at 870.

### CONCLUSION

The Court finds that, when the *Dataphase* factors are considered, Linc-Drop has sustained its burden of establishing the propriety of a preliminary injunction. The Ordinance has, as a practical matter, only two provisions of substance, and Linc-Drop has established that both of them are more than likely unconstitutional. Accordingly, the Court will enjoin enforcement of the Ordinance in its entirety.

The Ordinance is, in fact, so plainly contrary to U.S. Supreme Court precedent that the Court is somewhat surprised the case has reached this juncture. The Court had considered advancing trial on the merits, but the City objected, so the Court is *at this point* only entering a preliminary injunction. *See,* filing 58; filing 59; filing 62. The writing on the wall, however, should be readily apparent. The Court will, therefore, refer this case to the United States Magistrate Judge for progression toward a timely resolution.

That is not to suggest that the end result of this case is an absolutely, irrevocably, foregone conclusion. Nor is the Court suggesting that the City

could not take more narrowly-tailored measures: for example, directly proscribing or prosecuting fraud, or enacting reasonable registration or disclosure requirements to help citizens make informed choices. But it is difficult at this point to imagine what evidence or argument could save the Ordinance as it is currently written. The Ordinance says what it says, and the Supreme Court has said what it's said, and there's very little that can be done about either.

IT IS THEREFORE ORDERED:

1. Linc-Drop's motion for a preliminary injunction (filing 3) is granted.

2. The City, and its officers, agents, and employees, are preliminarily enjoined from enforcing any aspect of the Ordinance, pending a final judgment in this case.

3. This case is referred to the United States Magistrate Judge for further case progression.

Dated this 18th day of February, 2014.

BY THE COURT:

John M. Gerrard
United States District Judge